Joseph Cohen v. Commissioner.
Cohen v. Commissioner
Docket No. 110869.
United States Tax Court
1943 Tax Ct. Memo LEXIS 168; 2 T.C.M. (CCH) 602; T.C.M. (RIA) 43372; August 4, 1943
*168 Joseph Cohen, 515 Madison Ave., New York City, pro se. Walt Mandry, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This proceeding involves a deficiency in income tax for the calendar year 1938 in the amount of $3,370.65. Three questions must be decided, namely, (1) Is a so-called corporate dividend in the sum of $18,750 taxable to petitioner's wife and children, the record owners of the stock, or to petitioner? (2) Is petitioner to be treated as the owner of a brokerage account carried in his wife's name? (3) May petitioner deduct legal expenses paid or accrued in defending a criminal charge resulting in his conviction in 1942 and from which an appeal is pending? In determining the deficiency, respondent added to petitioner's income for 1938 $18,750 and $470, representing, respectively, a dividend declared by Capital Retirement Plan, Inc., and dividends paid on sundry stocks carried in a brokerage account. He allowed petitioner a long-term capital loss deduction of $3,033.71 arising from transactions in such brokerage account and $602 as interest paid thereon. A $12,000 deduction for legal expenses was disallowed. Petitioner claims that *169 each of these acts constitutes error. Petitioner is an individual having an office in New York City. The return for the period here involved was filed with the collector of internal revenue for the third district of New York. The proceeding was submitted on petitioner's own oral testimony and documentary evidence from which we make the following findings of fact. Findings of Fact In 1934 petitioner, under the name and style of Underwriters Group, initiated a plan of creating investment trusts with himself as trustor, a named bank the trustee and the purchasers of the certificates of beneficial interest the cestui qui trustent. The certificates were sold to the investing public at a price in excess of the cost of the petroleum interests which comprised the trust res, the difference representing petitioner's gross profit. During the following year petitioner caused Underwriters Group, Inc.; hereinafter called Underwriters, to be organized. Such company, of which petitioner was sole stockholder and president, thereupon continued the business in which petitioner had engaged as an individual. Underwriters employed retail salesmen who sold stocks and oil royalties. The trust certificates, *170 however, were marketed through a wholesale investment company, Tellier & Co., to which Underwriters had given an exclusive sales contract. Tellier & Co. distributed the certificates to the public through about 100 independent brokers. Petitioner, in the summer of 1935, caused the organization of Capital Retirement Plan, Inc., hereinafter called Capital. Its authorized capital consisted of 200 shares of no par stock of which but 75 were issued. The issued stock was evidenced by three certificates of 25 shares each, the record owners thereof being Hanna Cohen. Hanna Cohen as guardian of Jules Cohen, and Hanna Cohen as guardian of E. Martin Cohen, respectively. Hanna Cohen is petitioner's wife and Jules and E. Martin Cohen his minor sons. They took no part in the affairs of the corporation. The certificates were signed in behalf of Capital by petitioner as president and Edward A. Lynn as secretary-treasurer. The $750 subscription price for the 75 shares was obtained by petitioner from a savings account carried in his name in trust for E Martin and Jules Cohen. Petitioner had made deposits in this account which at no time exceeded $5,000. Capital's officers and directors were petitioner, *171 Mr. Kidd and Mr. Lynn. These men were also connected with Underwriters. After the formation of Capital it became trustor of investment trusts of the general character previously created by petitioner individually and, later, by Underwriters. The trust certificates created thereunder were sold for Capital by Underwriters pursuant to a written contract signed by petitioner as president of both corporations. Underwriters thereafter created no further trusts but confined its activities to selling certificates issued under the trusts of which Capital was trustor. Under the terms of its trust, Capital was entitled to a gross profit in the sum of 40 per cent of the selling price of the certificates. Three-fourths of this 40 per cent was withheld by Underwriters to cover its salesmen's commissions, overhead expenses and profit, under its arrangement with Capital, while one-fourth of the 40 per cent was credited to Capital's profit account and periodically paid over. The 60 per cent balance was held for Capital for property purchases. Capital had neither expenses nor employees and its only bound books were a journal and a general ledger. Its offices were Underwriters' offices and its records *172 were kept by Underwriters' employees. Its principal function was to purchase properties, and to deposit such with the trustee. In so doing it acted exclusively through petitioner. Payment for properties was made by check drawn by Underwiters against the credit existing in Capital's favor for property purchases, certificates being sold prior to the purchase and deposit of trust assets. By the terms of its second trust Capital was entitled to a management fee in a sum equivalent to 2 per cent annually on the billing price of the properties deposited plus 2 per cent on the income plus 2 per cent on the balances of any reserve fund. In 1938 the right to receive a part of this fee was sold through Underwriters for a net price of $18,750. This was Capital's entire income for the year. The consideration was received by Underwriters and credited to Capital's account. Underwriters later drew checks totaling $18,750 payable to petitioner. He cashed them and turned the proceeds over to Hanna Cohen, who placed the same in an account which at one time contained $40,000, of which $22,500 was subsequently turned back to petitioner. On August 15, 1938, after these checks were drawn. Capital's directors *173 declared an $18,750 dividend. In each of the years 1936 to 1937 petitioner drew a $15,000 salary from Capital but none from Underwriters. Capital's income exceeded $32,000 in 1936 and again in 1937. In 1938 petitioner drew no salary from Capital but drew $15,000 from Underwriters. The certificates issued under Capital's first trust agreement were known as "Underwriters Group Capital Retirement Plan Trust Certificates of Beneficial Interest, Series UG-A." Capital was characterized, in the prospectus relating to such certificates, as "An Entirely Owned Subsidiary of Underwriters Group, Incorporated." Underwriters was named sponsor of the issue. Petitioner operated a trading account with a brokerage company in the name of Hanna Cohen. It was opened with money which Mrs. Cohen had and continued with money which she received from Capital and withdrawals from the savings account carried in the name of Joseph Cohen in trust for E. Martin and Jules Cohen. Because of margin requirements a second account was opened in petitioner's name but this was merged with the Hanna Cohen account in 1938 or before. Prior to 1938 the profits from both accounts were reported by Hanna Cohen and the two *174 boys in equal portions. Petitioner had no written agreement with his wife or children respecting their interest in the account. Withdrawals might have been used for additional investments or taken by petitioner and repaid later on. Petitioner filed an income tax return for 1935 and therein stated that he kept his books on an accrual basis. In 1936 and 1937 he accrued only New York State income taxes, which he deducted. In 1938 he deducted $12,000 as "legal expenses". Of this sum, $4,500 was actually paid during the taxable year. Petitioner kept no books in 1938. The legal expense arose in connection with petitioner's indictment, with 75 others, for conspiracy to violate the mail fraud statute. The indictment specified Capital and Underwriters as being formed as a part of the conspiracy. Trial was commenced in 1941 and was concluded in March 1942 wereupon petitioner was convicted and sentenced. An appeal therefrom was pending in the Circuit Court of Appeals when this proceeding was heard. Opinion The first question is whether $18,750 declared in 1938 by Capital Retirement Plan, Inc., as a dividend, is taxable to petitioner or to the members of his family, the record owners of the *175 stock. Equal parts of this sum were reported for income tax purposes by Hanna Cohen, petitioner's wife, and Jules Cohen and E. Martin Cohen, his minor sons. Respondent, in determining a deficiency in petitioner's income tax for 1938, added such $18,750 to his declared income on the ground that this sum constituted income taxable to petitioner under the provisions of section 22 (a) of the Revenue Act of 1938. He argues that "the petitioner is the real owner of the dividends paid by Capital Retirement Plan, Inc." Petitioner grounds his opposite contention upon the fact that the other members of his family were in 1938, and at all times had been, the record owners of the stock certificates. He also urges that Capital must be regarded as a separate corporate entity in that it was created for a definite business purpose. It scarcely need be repeated that upon petitioner rests the burden of overcoming the presumption of correctness which attaches to respondent's determination. Moreover, in this instance, we think it not unfair to require of petitioner evidence of a most unequivocal kind, the acts taking place under his supervision resulting, as they do, in a division of income among the *176 several members of his family, with a consequential reduction in combined claimed tax liability. As we said in the case of : Arrangements within famillies for the diversion of income, while not necessarily subject to condemnation because of the close relationship of the parties, are always subject to careful scrutiny and clear and convincing evidence is required to establish their bona fides. See , . * * * Notwithstanding these reasonable burdens imposed upon petitioner, he elected to rest his case upon certain exhibits plus his own unsupported testimony which, in several material points, is vague, uncertain and replete with legal conclusions. Petitioner has cited in his brief numerous decisions involving transactions within family circles, which have been recognized for tax purposes. An analysis of these decisions, which we deem unnecessary to set forth, discloses that the bona fides of the transfers in each instance were established by substantial proof. Arguments and comparisons are no substitute *177 for evidence and in this proceeding we can not assume facts where the record is silent or ambiguous to establish a hypothetical situation analogous to those in the cited cases. Petitioner's position can be upheld only if supported by the evidence here introduced with all its weaknesses. An examination of the sum of petitioner's actions taken in connection with business operations unmistakenly reveals a studious effort to, at once, surround his activities with a dignity emanating from the corporate form and reduce his tax liability by causing profits to flow elsewhere than to himself. To accomplish these purposes he first occasioned the incorporation of Underwriters, issuing all its stock to himself. Thus, as a corporation, he carried on his profitable plan of producing trust certificates for sale to the investing public. Subsequently, he induced the creation of Capital, the stock of which was issued to members of his family. Capital, too, was merely a corporate cloak for petitioner's individual activities. However, in its case, the income, presumably, was to find its way to petitioner's wife and children through the medium of dividends. It is not to be doubted that persons may avail *178 themselves of any legally recognized method of doing business and the method adopted may not be disregarded simply because tax advantages accrue therefrom. Corporations have frequently been used as a means of reducing taxes. Moreover, it is elementary that dividends are taxable to the owners of the corporation. On the other hand, the taxation of income is not subject to dictates of mere form. A corporation may be a framework of ciphers and the issuance of a stock certificate may be an empty gesture. As was said in : * * * The question always is whether the transaction under scrutiny is in fact what it appears to be in form. * * * it is always the intent that controls; and we need not for this occasion press the difference between intent and purpose. * * * Should it here appear that the matter and things upon which petitioner relies are not what they seem to be, then we are not bound to give them the contended effect. This was well stated by Justice Reed in , wherein he said: * * * The Government may look at actualities and upon determination that *179 the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. * * * If Capital was a real subsisting corporation and if petitioner's wife and children were the true purchasers and owners of the stock thereof, petitioner's case signally fails to so indicate. On the contrary, the record clearly shows that Capital was but a name and that earnings which petitioner attributes to it were not only subject to his control but were in fact, actually received by him. Furthermore, petitioner's acts show that it was his intention that this should be the case. Capital was organized, we are told, to circumvent the binding effect of a sales contract covering Underwriters securities and to avoid discord with brokers through whom such securities were distributed. Yet Capital's issues, which were created in keeping with petitioner's original formula, were denominated "Underwriters Group Capital Retirement Plan Trust Certificates of *180 Beneficial Interest" sponsored by Underwriters Group, Inc., a name which would scarcely permit of distinction from Underwriters' own certificates. Capital had neither expenses, fixed assets, a separate office, employees nor, we can assume, a bank account. All its functions involved services performed by petitioner. The services were identical in character to those formerly performed by petitioner as president of Underwriters, of which he was sole stockholder. Checks to pay for property purchases were drawn against a credit account existing on Underwriters' books. All these circumstances refute any real identity apart from that of Underwriters. In this regard it is to be noted that, though petitioner consistently drew unto himself a $15,000 total salary in each of the years 1936, 1937 and 1938, such salary was debited in its entirety against Capital's earnings in 1936 and 1937 and against Underwriters' in 1938. Petitioner's free hand is here apparent and his manipulations to create fictitious net earnings evident when reference is made to Capital's "income" in 1936 and 1937 as compared to 1938. Moreover, assuming Capital to warrant a separate treatment for all purposes, it does not *181 necessarily follow that the record owners of its stock are the ones against whom the tax on dividends must be assessed. . It is the real owners of property who must bear the tax burden on income attributable to it and it is the command of such income and its benefits which marks the real owner. ;; . By his determination respondent has declared petitioner to be the real owner of Capital's stock, hence placing upon him the burden of controverting this assumption. . Petitioner produced no evidence to sustain his burden other than to introduce the stock book and certificates which, as we have pointed out above, are not in themselves conclusive of ownership. Upon cross-examination, however, it was developed that this stock was purportedly sold to Hanna Cohen and the two boys in equal portions. Hanna Cohen's claimed purchase was made with money drawn from an *182 account nominally in trust for her sons. The boys knew nothing of the stock and there is no suggestion that they were aware of the account. Moreover, petitioner himself actually made the withdrawal to make this investment in himself in corporate form. The difficulties which arise in attempting to bring the issuance of the stock within the concept of a legitimate sale or even a bona fide gift are obvious. See ;. It is quite apparent that the issuance of the stock in the names of Hanna Cohen and the boys was simply a step in a scheme to reallocate income within the family group. The scheme must fail from a taxation standpoint since the little evidence, which we have, suggests that petitioner at no time relinquished control thereof. Even the so-called dividend payment with which we are here concerned was made by checks payable to petitioner rather than the record owners of the stock and, peculiarly, these checks were drawn by Underwriters rather than Capital. These circumstances emphasize the lack of substance in the transactions as well as petitioner's *183 intent that the income should not escape his direction. See . Finally, the series of transactions of which the incorporation of Capital and the issuance of its shares were but parts was an "anticipatory arrangement" within the doctrine of . See also . Moreover, petitioner has failed to overcome the presumption that he was the real owner of Capital's stock. Respondent did not err in taxing the $18,750 declared dividend to petitioner. The second issue is similar to the first. We are to decide whether dividends of $470 paid in 1938 on stock held in a brokerage account carried in the name of Hanna Cohen, are taxable to petitioner or to the other three members of his family on the theory that the account was in trust for them. There is nothing in the record to substantiate a finding that the corpus or income of these trading accounts was impressed with a trust. Petitioner testified that the account was opened by him with his wife's money. Assuming this to be so, there is no showing that Mrs. *184 Cohen had any intention that two-thirds of the purchases made with this money or the income derived from trading should constitute assets or income of the children. No written trust instrument was executed by petitioner, and so far as we know none was executed by Hanna Cohen. We are told that additions to this trading account were made from money derived from Capital. This, we have found, was petitioner's. Furthermore, with respect to the boys' bank account, we find petitioner testifying as follows, "I took the money out several times to add to a margin account I was reserving for their mother." Presumably, this is the same Hanna Cohen trading account which petitioner, in another breath, states to be in trust for his wife and the boys. No evidence was sought to be introduced, with reference to the brokers' understanding regarding the ownership of the accounts. What little evidence the record contains on this issue shows that petitioner had no clear conception with respect of the trading accounts except when it came time to file income tax returns. Cf. . He then uniformly caused his wife and sons to each report one-third *185 of the profits arising therefrom. Otherwise, no consistent course was followed either as to the source from which the deposits in the accounts arose or the use which was made of the income therefrom. The only conclusion to be drawn from petitioner's confused and inconsistent testimony is that petitioner exercised complete control over the accounts and the profits made, including the dividends here sought to be taxed to him. This necessitates the approval of respondent's determination on this issue, regardless of the fact that the dividends were reported and a tax paid by the claimed beneficiaries. . Since income arising from the trading account is taxable to petitioner, it follows that respondent properly allowed petitioner deductions for long-term capital loss and interest charged in asserting the deficiency, both deductions being attributable to the account. The final issue involves the deductibility of legal expenses incurred in defense of a criminal action, the charge being conspiracy to violate the mail fraud statute. The indictment was found and presented in 1938 during which year petitioner paid $4,500 on account of *186 a $12,700 defense fee, accruing the balance. The trial, which resulted in petitioner's conviction, was not concluded until 1942 whereupon an appeal was perfected. This appeal was pending when the instant proceeding was heard. It has frequently been held that legal fees expended in connection with a criminal charge wherein a taxpayer's guilt is established are not deductible. ; ; . While petitioner subscribes to the rationale of these cases, he contends that such as not here applicable inasmuch as his guilt was undetermined in a trial court until long after the end of the taxable year 1938 and, further, because his conviction yet remains subject to reversal in the Circuit Court of Appeals. It is true that the courts, in proper circumstances, have permitted the deduction of criminal defense fees as an ordinary and necessary business expense in instances where the taxpayer has been cleared of the charges. ; *187 ; . We must decide whether, for the purposes of this proceeding, it is necessary to regard petitioner as guilty or innocent of the criminal charge found in the indictment. It is obvious, we think, that the criminal action arose in connection with petitioner's business of creating investment trusts and selling the beneficial certificates thereof to the general public. We have found in our findings of fact that the two corporations through which petitioner acted and derived his income were specified in the indictment as having been formed as a part of the conspiracy. Accordingly, the legal fees expended in defense of the charged conspiracy are deductible as an ordinary and necessary business expense ( ) unless disallowed upon grounds of public policy under the doctrine of the previously cited authorities. There can be no question but that the deduction of the legal expenses must be taken in the year paid or accrued. . *188 Petitioner contends that $12,000 was so paid or accrued during 1938, the taxable year here involved. For present purposes, we assume this to be a fact and, therefore, it follows that this deduction must be claimed on the 1938 tax return. However, on March 15, 1939, when petitioner's 1938 return was due, the ultimate propriety of this deduction was unknown since it then could not be ascertained whether petitioner would be found innocent or guilty of the criminal charge in defense of which the expenses arose. In these circumstances, then, should petitioner be permitted to deduct the expenses? We think not. While the Government should not be the recipient of taxes in an amount greater than that to which it is entitled under the revenue laws, we believe that no rule is to be established which would unduly jeopardize the collection of its proper dues. A holding that the instant legal expenses are deductible, when their validity as a deduction is subject to the happening of a future event, would constitute such a rule. In order to assure himself of the collection of the proper tax, it would be incumbent upon the Commissioner to follow every criminal trial and appeal therefrom to its final *189 conclusion in all instances where such a deduction had been claimed under conditions similar to those which exist here. Obviously, this would place a burden upon the Commissioner entailing the expenditure of time and money which, in the final analysis, belong to the public generally. As the alternative in this procedure, the Commissioner might rely upon the good faith of the taxpayer and assume that he, in instances where his guilt had been finally determined, would have the inclination and wherewithal, while, perhaps, languishing in confinement, with his assets reduced by a substantial fine, to voluntarily file an amended return and pay an additional tax. We are not so naive as to believe that this alternative, in the long run, would result in the assessment of correct taxes. A much more practical rule and one easier of administration would be the disallowance of the deduction where its ultimate propriety is unknown. The taxpayer, being in the best position to learn the result of his criminal prosecution, could, in the event of his acquittal, file an amended return, and claim a refund. Self interest again would intervene but, under this method, the payment of the proper tax would *190 more likely result. Seldom would a criminal case remain undecided beyond the limitation period for claiming refunds. Moreover, the so-called "presumption of innocence" does not militate against this treatment of the conditional deduction. The presumption is not regarded as evidence. ; . Rather, it is but a rule about the duty of producing evidence on the part of the prosecution and conveys for the jury a special and additional caution to consider no surmises based on the present situation of the accused. Wigmore on Evidence, 3rd Edition, [*] 2511. In any event, it is a presumption indulged in upon the trial of the accused for violation of a penal law. It has no application in a proceeding involving income tax. In the present case, since petitioner has not been acquitted, we think respondent's action in disallowing the deduction for legal expenses was proper for the reason stated above. The respondent's determination can be upheld on another ground, however. Petitioner has been, in fact, convicted and sentenced by the trial court for conspiracy *191 to violate the mail fraud statute. Though petitioner has availed himself of the right of review, still, upon the evidence, he stands convicted. He can avoid the conviction only upon a showing that prejudicial error intervened in his trial. In all probability petitioner's case is before the Circuit Court of Appeals on the record on appeal and a bill of exceptions. However, we are not to presume that the assigned errors, even if they can be said to be such, were prejudicial. As was said in , * * * an error is not presumed to be prejudicial. The burden of showing prejudice is upon the appellant, and he is not entitled to the reversal of a judgment or conviction unless it appears that he has been denied some substantial right and has been thereby prevented from having a fair trial. * * * See also . In the circumstances, there is no warrant to regard petitioner as innocent of the criminal charge. We conclude that respondent did not err in disallowing $12,000 claimed in 1938 as a deduction for legal expenses. In view of this holding *192 it becomes unnecessary to decide an alternative question concerning the correctness of accruing a portion of such amount. Decision will be entered for respondent.